STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
STEPHEN DOUGLAS WARD, DEFENDANT-APPELLANT.

Argued September 15, 1970—Decided October 26, 1970.

*Mr. Stanley C. Van Ness,* Public Defender, argued the cause for defendant-appellant (*Mr. Richard Newman,* Deputy Public Defender, on the brief).

*Mr. Samuel J. Serata,* Assistant Prosecutor, argued the cause for plaintiff-respondent (*Mr. Joseph Tuso,* Prosecutor

for Cumberland County, attorney; *Mr. Samuel J. Serata* on the brief).

The opinion of the court was delivered by

PROCTOR, J. The defendant, Stephen Douglas Ward, was found guilty by a jury of possessing marihuana in violation of *N. J. S. A.* 24:18–4, and was sentenced to serve a State Prison term of two to three years and fined $100. He appealed his conviction and sentence to the Appellate Division. That court, in an unreported opinion, affirmed the conviction but expressed its view that a sentence to the reformatory rather than State Prison would have been more appropriate. It did not pursue the point, however, since defendant had recently been transferred to the Yardville Youth and Correctional Center and was to be released in a month or two. We granted defendant's petition for certification. 54 *N. J.* 581 (1969).

The following facts are relevant to this appeal. About 8:00 o'clock in the evening of June 7, 1968, the police, pursuant to a warrant, searched the defendant's home where he was living with his mother and his brothers and sisters. The search uncovered a small package of marihuana in defendant's bureau drawer, a pipe stem containing marihuana in defendant's desk drawer, and the remnant of a marihuana cigarette in a room adjoining the defendant's. The total value of the seized drug was said to be about $2.50. The defendant denied all knowledge of the cigarette and the package. However, he admitted that he placed the pipe stem in his desk, and that the stem was used to smoke marihuana. His explanation was that the stem was owned by a friend, that the friend brought it to the defendant's house to demonstrate its use, and that the friend left it there. Later the defendant put it away in his desk drawer and forgot about it. On his direct examination he admitted that he had occasionally smoked marihuana in the past, but denied that he had ever bought or sold any. He explained

that any marihuana he had smoked had been given to him.

On this appeal, defendant first urges that he was denied a unanimous jury verdict. When the jury returned, the foreman announced a verdict of "Guilty as charged." Upon being polled, the first eight jurors stated "Guilty as charged." However, the ninth juror stated "Guilty of possession of pipe stem." The last three jurors repeated the verdict "Guilty as charged." Before the Appellate Division, the defendant contended that the ninth juror's verdict responded neither to the indictment nor to the judge's instructions to the jury and was thus fatally defective. The Appellate Division rejected the argument holding that when the verdict was considered in light of the testimony, "it constituted a statement by [the ninth juror] that she found the charge of defendant's illegal possession of narcotics proven as far as the marijuana in the pipe stem was concerned." Before us, defendant argues that the Appellate Division's holding was reached by an impermissible "molding" of the verdict. We disagree. There is no doubt that a finding that the defendant knowingly possessed one of the three items charged would be sufficient to sustain a verdict of guilt. See *State v. Huggins*, 84 *N. J. L.* 254, 258 (E. & A. 1913); *State v. Shelbrick*, 33 *N. J. Super.* 7, 10 (App. Div. 1954). The only question is whether the ninth juror's answer on the poll was "sufficiently certain and specific to identify the crime and be responsive to the issue raised by the indictment and the plea." *State v. Weber*, 127 *N. J. L.* 274, 278 (Sup. Ct. 1941). We think it was. The jury was charged that for the defendant to be guilty of possession of marihuana, he must have "intentional control" of the substance "accompanied by knowledge of its character." Thus, a verdict of guilty would require a finding by the jury that defendant was aware the pipe stem contained marihuana. It is common knowledge that persons are not "guilty" of merely possessing pipe stems. The ninth juror undoubtedly would have voted for acquittal if she believed either that the pipe stem did not contain marihuana or

that the defendant did not know it contained the substance. But she did not vote for acquittal, and her pronouncement of "Guilty of possession of pipe stem" is sufficiently responsive to the charge. We add that our examination of the record discloses no basis for concluding that defendant was unaware of the marihuana found in the pipe stem. He was no stranger to marihuana. He was fully aware of what it looked like and the methods in which it was used. In fact, he admitted that the pipe stem for which he was convicted had been the subject of instructions on one of these methods at his home. While we believe that the trial judge should have sought clarification from the ninth juror, the absence of any action by defense counsel indicates to us that no one doubted the import of her response. *Cf. State v. Johnson,* 31 *N. J.* 489, 511 (1960).

Defendant's next contention is that the trial judge made impermissible comments to the jury which denied him his right to a fair trial by an impartial jury. Defendant concedes it is well established in this state that a trial judge may comment on the evidence as long as he leaves to the jury the ultimate determination of the facts and a rendering of the verdict on the facts as it finds them. *State v. Mayberry,* 52 *N. J.* 413, 439–440 (1968); *State v. Laws,* 50 *N. J.* 159, 177 (1967). In the present case the trial judge, in the course of his charge, made the following remarks:

Now, how do you decide a case? You decide it from the sworn testimony as you heard it and the law as the court gave it to you.

*Now, this case should not be a troublesome one, because it's a classic case for a jury.* I shall not endeavor to recall to you my recollection of what the witness said, because I observed you listened attentively to all the state's witnesses and you listened attentively to the defendant's.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

Now, you will have to determine from the witnesses and that which they said and the law as the court gives it to you, to determine whether this defendant is guilty or not guilty, and I again reiterate, *you shouldn't have any trouble whatsoever.* (emphasis added)

Defendant contends that the italicized comments conveyed to the jury the judge's desire for a quick verdict of guilty. In other words, he argues that the remarks constituted an opinion by the trial judge of the defendant's guilt.

Our rule on the trial judge's right to comment on the evidence is a broad one. We have gone so far as to say: "[i]t is, of course, no ground for reversal that a trial judge, in cases where he thinks it is required for the promotion of justice, expresses his views on the weight and value of evidence, even to the extent of an opinion as to guilt, so long as he plainly leaves the sole determination of all factual issues to the jury, * * *" *State v. Begyn,* 34 *N. J.* 35, 53 (1961). Whether a judge's comment is tolerable depends upon the facts of every case. Ordinarily it is unnecessary for a court to enter into that area. Here it is enough to say that we do not believe that the judge was restricting the freedom of the jury or even meant to indicate an opinion that the defendant was guilty. Taken in context, the remarks in the charge conveyed to the jury the judge's opinion that the issue before it was a simple one. It was not disputed that marihuana was found by the police in the defendant's home. The basic issue for the jury was whether he knowingly possessed the substance. Reading the charge in its entirety, we find that it was not misleading. The judge was merely instructing a jury of laymen that the issue was not complicated and wouldn't be difficult to resolve one way or the other. Moreover, the trial judge specifically instructed the jury that it was the sole finder of the facts. Under these circumstances we find no error.

 Finally, defendant urges that his sentence was excessive. As previously stated, the trial judge sentenced him to State Prison for a term of from two to three years and fined him $100. *N. J. S. A.* 24:18–47(c)(1) provides that the punishment for the illegal possession of narcotics shall be "for a first offense, by a fine not exceeding $2,000.00 and by imprisonment, with hard labor, for a term of not

less than 2 years nor more than 15 years." However, this provision is qualified by *N. J. S. A.* 2A:168–1 which deals generally with the power of courts to suspend sentences "[w]hen it shall appear that the best interests of the public as well as of the defendant will be subserved thereby, * * *" That statute contains a provision which deals explicitly with narcotics convictions:

"The provisions of this section shall not permit the suspension of the imposition or execution of any sentence and the placing of the defendant on probation after conviction or after a plea of guilty or non vult for violation of any provision of chapter eighteen of Title 24 of the Revised Statutes *except in the case of a first offender.*" (emphasis added)

Since it is conceded that defendant was a first offender, the trial court had the discretion to suspend sentence. Defendant urges that the trial judge misused his discretion in not following that course. It is clear that this Court has the power to review any exercise of the trial court's discretion, including the power to revise a prison sentence where it is manifestly excessive, even though within statutory limits. *State v. Bess,* 53 *N. J.* 10, 18–19 (1968). After reviewing the record and the probation report, we think the sentence was entirely too harsh.

At the time of the offense defendant was eighteen years old. He is from a home of eight children. His father does not live at home and his mother supports the family from her earnings as a school teacher. Stephen is brighter than average (I.Q. 124) and was a high school graduate at the time of his arrest. To help support his family he held down two part time jobs while going to college at night. He has no previous criminal record. He admitted having smoked marihuana, but this is his first conviction. It is true that Stephen's offense was committed despite some pre-warning, since prior to his arrest there had been an unsuccessful search of his home under a duly issued warrant. And it is also true that the presentence report indicates that there had been "pot parties" at the defendant's home at-

tended by young boys and girls. The sentence was imposed prior to *State v. Kunz,* 55 *N. J.* 128 (1969) calling for the disclosure of prejudicial material in the presentence report, and apparently the defendant was never given a chance to be heard on that material. We do not know whether the allegations in the report figured in the trial court's sentence. The prosecutor thought that they did not. In any event, if their truth is assumed, still there is no suggestion that the defendant was a seller or inducer. We think that a two to three year unsuspended sentence in State Prison for a first offender, whose possession is incidental to his own use, is far too severe.

We granted certification in this case primarily to establish guidelines for the sentencing of first offenders who were found guilty of possessing marihuana for their own use. We cannot escape the unhappy fact that our youth have been involved with marihuana in disturbing numbers. That this is so does not palliate the wrong. Nor should we be thought to encourage or condone such conduct. The statute should and will be enforced. But it remains the policy of the law to reform the youthful offender. Sentencing judges should direct the punishments they impose to the goal of reformation. Too severe a punishment will do little towards advancing this goal. Incarceration is a traumatic experience for anyone. The effect must be particularly devastating upon young persons such as the defendant here. A sentence of two to three years in State Prison in a case like this will probably be more detrimental to both the offender and society than some other discipline. Even a sentence to a reformatory as suggested by the Appellate Division may be more punitive than is required. We think that generally a suspended sentence with an appropriate term of probation is sufficient penalty for a person who is convicted for the first time of possessing marihuana for his own use. Probation is designed to aid both society and the offender by affording opportunity for correction under suitable supervision. It is hoped that during the probation

the offender will establish himself as a law-abiding member of the public and thus avoid the need for confinement with its possibly adverse consequences. See *Adamo v. McCorkle,* 13 *N. J.* 561, 563 (1953).

Finally, where appropriate under the facts of a case, the offender might be dealt with as a "user" under the disorderly persons statute, *N. J. S. A.* 2A:170–8, rather than as a "possessor" under the criminal act, *N. J. S. A.* 24:18–4, in order that the conviction will not result in a criminal record. See *State v. Reed,* 34 *N. J.* 554, 573 (1961).

In concluding that sentences for first offenders should be suspended, we believe we are in keeping with the legislative will. When the Legislature adopted more stringent narcotics penalties in 1952, it explicitly left open the possibility of suspended sentences for first offenders. *N. J. S. A.* 2A:168–1, *supra; L.* 1952, *c.* 267. In doing so it acted on the basis of a Legislative Commission Report which evinced a policy that first offenders who are essentially users not be incarcerated. This recommendation dealt not only with marihuana offenders, but with users of hard drugs as well. See *Report of Study and Recommendations of the Legislative Commission to Study Narcotics* at 22 (1952).[1] In the

---

[1]The study reported: "First of all, many of the first offenders are young men and women who are users and who have become entangled with the law for the first time. Hospitalization plus skillful guidance will salvage a great many more of these than incarceration. Says Dr. Victor H. Vogel, former Medical Officer in Charge, U. S. Public Health Service Hospital, Lexington, Kentucky, "There is little defense for the predatory, non-addict drug sellers who exploit our youth for profit. However, laws providing severe mandatory penalties for all who are technically guilty of selling drugs would prevent the rehabilitation of many of the younger addicts. This is true because drug users frequently sell small quantities of drugs to friends or acquaintances to obtain money to supply themselves with enough narcotics to prevent withdrawal suffering. Successful medical treatment and rehabilitation may better be accomplished if the court can give this type of patient a short sentence to a hospital or place him on probation, giving his doctor authority to release him when the best results of treatment have been attained.' "

present case the defendant had been released on parole at the time of the oral argument. For purposes of his record, however, we amend defendant's sentence by directing that it be suspended. We are not adding a provision of probation because of the time period which has already expired..

Since the argument in this case, a new statute has been enacted which deals comprehensively with the problems of drugs. *L.* 1970, *c.* 226, approved by Governor Cahill October 19, 1970. The statute lowers the penalties for possessing a small quantity of marihuana and reduces the category of the offense to that of a disorderly person. The statute under which the defendant was tried will be repealed 90 days from the date of the enactment of the statute (§ 48), but the repealer does not abate past or pending prosecutions (§ 40). We expect that any sentences imposed within the 90 day interim will be in conformance with this opinion.

The judgment of conviction is affirmed, but the sentence is modified.

FRANCIS, J. (dissenting). I would reverse this conviction and order a new trial. Aside from the grossly excessive sentence, the defendant did not receive a fair trial.

Stephen Ward, who was 18 years of age at the time of his arrest on June 7, 1968, lived with his mother and six brothers and sisters in a one-family frame dwelling in Vineland. N. J. There were three bedrooms, each containing twin beds, on the second floor, occupied by the children, and an additional bedroom on the first floor occupied by the mother. Defendant Stephen shared a room "right at the head of the stairs." with one of his brothers. The mother had been supporting the family as a school teacher for a number of years. Apparently there was no financial aid from the fathers of the children. At the time of this alleged offense, the oldest daughter, Jacqueline, aged 21 years, was in the Women's Marine Corps but living at home, awaiting assignment to active duty.

Stephen was employed during the day and in the evening attended the liberal arts course at the Cumberland County

College. As the majority opinion indicates, he was a "brighter than average" boy with an I. Q. of 124. He was interested in classical and modern music and wrote poetry and stories. He had a record player in his bedroom and on occasions his classmates and friends, male and female, congregated in his room and the adjoining connecting one to talk and listen to records. His mother was aware of the young peoples' visits and approved of them. She said she preferred having her children at home and liked them "to have company when they [could]." The friends were welcome as long as they were "respectable," and not too noisy or "doing things that would be harmful." Six months or a year before her son's arrest, she had asked her children not to have "as much company coming in" and not to take girls upstairs unless she was "right there."

That testimony of the mother produced one of several interjections by the trial court. On direct examination, the mother was asked if it was unusual for Stephen to have three or four visitors. The question was allowed over the prosecutor's objection, the court saying, "I think she said she permits her son to have guests so long as they are respectable, and I will find out what she means by respectable." A little later when an objection was made that discussion of an earlier fruitless police search of the premises was immaterial, the court suggested it might be material

\* \* \* [b]ecause she says she lets respectable people in there, it might be interesting to find out what they were doing there a year ago before to give her notice about respectability.

Then, after indicating that her children abided by the guidelines she laid down about company, the Court interrupted:

"Q. You still have the same rule?
A. Yes, I do.
Q. As of just a few days ago, too?
A. Yes, I do.
Q. You enforce it, I assume?

A. To the best of my ability, sir.
Q. Well, what is your opinion as to your ability?
A. Well, I work.
THE COURT: I see."

At about 7:30 P.M. on June 7, 1968, Ward came home accompanied by three friends, one male and two young ladies. He said he told his mother (who was resting in her room) that he had some company. The mother heard the young people come in but had no recollection of her son saying anything to her. Apparently, all the other children were home at the time. The oldest sister, Jacqueline, was in her room on the second floor. Ward and his friends went upstairs and started the record player. There were no chairs in the bedrooms and he and one young lady sat or reclined on one bed, while the other couple did the same in the connecting room the door to which was open. A short time later another young man, Robert Carroll, aged 17 years, came in, spoke to them for a few minutes and then apparently went down the hallway and began talking with Ward's sister Jacqueline.

Over defense objection, the prosecutor was allowed to question defendant's mother about Carroll as follows:

"Q. Did you know at that time that he had been charged with an offense?
A. Charged wtih an offense?
Q. Yes, previous to June 7 of 1968. In other words, prior to the night that the police visited your house, you knew Robert Carroll, I assume, before that?
A. I knew him, yes.
Q. Did you know he had been charged with an offense prior to that?
A. I didn't know whether he was charged with an offense or not. I knew what I had seen in the paper about what had happened to him at the high school.
Q. I see. And nevertheless you felt that it was all right to have him socially come in contact with your son. Was that within your parental wishes too or was that contrary to your parental wishes?
A. Before this happened Bob had been friends with Stephen for at least a couple of years.

Q. And you saw no reason to terminate the relationship or curtail it or cut it down in any manner after what you saw in the newspaper about this Robert Carroll?
A. No, I didn't."

On redirect examination, the witness said she didn't know "what happened to" Carroll, and she did not know whether, whatever the charge, he was found innocent or guilty or whether the matter was still pending. That kind of cross-examination is not only improper; in my judgment, it is inexcusable.

About 8:30 P.M., the officers came into the house with a search warrant. When they went upstairs into the bedrooms the record player was in operation. No one was smoking and the detectives did not suggest they detected any marijuana odor. Detective Tirelli searched the room defendant was in; Detective Coccaro searched the adjoining one. Detective Tirelli recognized that a brother of defendant probably shared the room with him because of the twin beds. The dresser in the room was searched and in the second drawer the detective found the small envelope containing the green vegetable matter. There was clothing in the drawer, most of which the detective thought belonged to Stephen. As he put it, Stephen's clothing was "probably mixed with some of his brother's, but most of it was Stephen's." He was positive that Stephen Ward's clothes were there but "they might be mixed with his brother's."

Stephen denied that the envelope belonged to him, that he put it in the drawer, or that he knew it was there.

Detective Tirelli then found the pipe stem, referred to in the majority opinion, in the drawer of a desk in the bedroom. Apparently it was a cutdown stem into which, according to the testimony, marijuana (not in cigarette form) was put, held in place (in a manner not clear from the testimony) and smoked. Defendant denied he had ever used the stem but admitted on the witness stand that he knew it was in the desk. He said that a friend, whose name he gave to the police and in court, brought it to his house

two or three weeks earlier and apparently forgot it. Ward
put it in the desk and left it there. He never used it. Ac-
cording to the State's proof, a chemist took out some resi-
due that was on the inside of the pipe stem and tested it.
The test showed it to be marijuana. There is no evidence
to indicate that defendant knew there was marijuana in
the stem.

The pipe stem produced another trial court intervention
incident. While defendant's mother was testifying on di-
rect examination, she said her son had never owned or
smoked a pipe to her knowledge. The court then asked:

"Q. Has your son ever used a stem where they put cigarettes
in there?
A. No.
Q. Generally marijuana cigarettes?
A. No. I have never seen him with one.
THE COURT: I see.
MR. PERONE: Your Honor, I don't think I understand
when the court says a stem where they put cigarettes, gen-
erally marijuana.
THE COURT: A mouth stem, looks like a pipe stem, generally
designed for that purpose."

There was no testimony in the case that the pipe stem was
used or could be used as a holder for marijuana cigarettes
or any other kind of cigarettes.

Detective Tirelli said there was an ashtray in Stephen's
room containing stubs of ordinary commercial cigarettes.
In his testimony, Ward said he had been smoking Salem
cigarettes, his usual brand.

In the connecting bedroom which was being occupied
by the other couple, Detective Coccaro found a stub or
remnant of a partially consumed marijuana cigarette. Other-
wise his search there was nonproductive. There was no
smoke in the room, the stub was not burning nor was it
hot. According to a chemist's test, the remnant contained
marijuana.

At the close of the case, there was no testimony connect-
ing Ward with the stub of the marijuana cigarette found

in the adjoining bedroom. I see nothing of any substance to indicate that he knew there was some marijuana residue in the pipe stem. It is almost absurd to suggest that he criminally possessed that residue and exercised knowing control over it. With respect to the small quantity of marijuana in the envelope found in the shared dresser drawer of the joint bedroom, there were inferences of possession by him. But he denied that the envelope was his, that he knew about it, or that he put it there. Considering the number of persons in the house, the obvious freedom of movement about the various rooms, and the frequency of outside visitors in the various bedrooms, the jury could have found a reasonable doubt about his guilt of criminal possession of any of the marijuana found in the bedrooms, if they had not been turned away from the defense by the court's attitude toward it. That attitude reached its prejudicial crescendo in the charge to the jury.

Obviously defendant's credibility was an important factor from the jury standpoint. In the context of the whole case, I think the court's attitude and its charge undermined unfairly defendant's chance of success on that vital issue. Three times in the charge the court made similar comments:

Now, you will have to apply your recollection as to what the testimony was, and I am sure you shall have no problem whatsoever.

\* \* \* \* \* \* \* \*

Now this case should not be a troublesome one, because it's a classic case for a jury. \* \* \*

\* \* \* \* \* \* \* \*

Now, you will have to determine from the witnesses and that which they said and the law as the court gives it to you, to determine whether this defendant is guilty or not guilty, and I again reiterate, you shouldn't have any trouble whatsoever.

\* \* \* \* \* \* \* \*

Now, you noted the attitude of the defendant himself when he took the stand. How did this defendant impress you? You may consider that there is no person in the entire world more interested in the outcome of this case than the defendant, and it is proper for you to inquire whether that interest caused him to color his testimony and depart from the paths of truth.

These remarks cannot be considered in isolation. They must be added to the atmosphere which I think pervaded the courtroom when they were made. In combination with that atmosphere, they unfairly prejudiced the defendant's cause and I cannot escape the feeling that the record in its totality fairly breathes the trial court's view that defendant ought to be convicted.

The pattern of the trial was very much like that presented in *State v. Lemon,* 107 *N. J. Super.* 101 (App. Div. 1969). There the same trial court was reversed for improperly questioning the defendant and later charging the jury on the issue of credibility in much the same manner as was done in this case. Speaking about their fact-finding function on that issue, he said, "Now, * * * it shouldn't be hard at all." Later, toward the end of the charge, he repeated: "You heard it [the facts] and it shouldn't be any trouble whatsoever, none at all. * * *." These comments were in context with statements that the judge was "rightfully proud of the prosecutor" and that he was "mighty proud of our policemen * * *." Defense counsel objected to the comments which indicated the jury should not have any trouble with the case and the court told the jury that those comments related only to the fact that the trial was a short one. In spite of this supplementary statement, the Appellate Division reversed the conviction holding that on the whole record defendant had been denied a fair trial.

In the present case, defense counsel objected to the portion of the trial judge's charge in which he told the jury they should not have "any trouble whatsoever" in deciding the issue of truthfulness. However, unlike the *Lemon* case, the judge gave no further explanation of the significance of his comments.

Although the above incidents of the trial warrant a new trial before an uninfluenced jury, still if none of them was present, there is another error which of itself compels a reversal. When the case was sent to the jury, the State's

claim of unlawful possession of marijuana (*i. e.,* intentional control of it accompanied by knowledge of its character) rested on three bases. (1) The partially consumed marijuana cigarette found in the bedroom adjoining defendant's. A finding of possession by the defendant could not rest on that proof alone. (2) The matter allegedly taken from the inside of the pipe stem. There is no doubt that Ward possessed the pipe stem. His uncontradicted testimony, however, is that a friend left it at his home and he put it in his desk, without ever using it. The facts have to be strained to their utmost to produce even a gossamer thread inference that defendant knew there were some left-over particles of marijuana inside the pipe stem and that he intended to exercise control over them. (3) The small envelope containing marijuana which had been found in a drawer of the dresser apparently containing articles of clothing of Ward and one of his brothers. Under the charge of the court the task of the jury was to decide on the proof supporting the three claims whether defendant was guilty of unlawful possession of marijuana.

When the jury returned to the courtroom, the foreman said the verdict was "Guilty as charged." Defense counsel requested that a poll be taken and the court said to the jury:

"Now, as the clerk calls the roll, and by name you have to give *your own* verdict. You follow me?" (Emphasis added.)

The clerk began the poll with the foreman of the jury who responded: "Guilty." The court immediatley intervened:

"Is that your whole verdict? Because it's different than what—the way you announced it."

The foreman then said:

"Guilty as charged."

The next seven jurors made the same announcement. However, the ninth juror said:

"Guilty of possession of pipe stem."

The last three jurors reverted to the foreman's statement of their verdict. Without comment or inquiry as to the significance of the ninth juror's verdict, the court entered a unanimous verdict of "Guilty as charged." In doing so, I believe the court failed in the discharge of its duty. In light of the facts in the case, as well as the court's quest for specificity as to the foreman's verdict and his warning that each juror should give *his own* verdict, the ninth juror's statement of her finding was so incongruous, and its meaning so doubtful, to say the least, as to impose an inescapable obligation on the court to inquire as to its significance. See *State v. Butler*, 27 *N. J.* 560, 608 (1958); *R.* 1:8–10. To assume that it had the same connotation as "guilty as charged" must be deemed plain error.

The juror's verdict was reasonably susceptible of the conclusion that she did not or could not find beyond a reasonable doubt that Ward had unlawful possession either of the envelope containing the marijuana or of the cigarette stub. However, since he admitted possession of the pipe stem which could be used in connection with the smoking of marijuana, it may have seemed reasonable to her to find him guilty of possession of such an instrument. But her express statement revealing her finding that Ward had possessed such a stem may well have been intended to indicate the limit of her finding and to show she was not convinced beyond a reasonable doubt that defendant knew there were vestiges of marijuana inside the stem. No one can be reasonably certain about the true meaning of the odd verdict. Whatever we as judges might think of the defendant's guilt or innocence if we were performing the function of the jury, can we possibly think the verdict as entered by the trial court without inquiring as to the one juror's real

intention so indubitably signified a unanimous verdict of guilty of possession of marijuana as to justify depriving this young man of his liberty and sending him to State Prison?

Although I think defendant's conviction should be reversed, I agree with the majority that the sentence of 2 to 3 years in State Prison was grossly excessive. In addition, the events which followed in its wake were tragic.

Ward was committed to prison on November 7, 1968. After about two weeks in that confinement, it became necessary to transfer him to the New Jersey State Hospital for the Criminally insane. He remained there until January 21, 1969 when he was returned to prison. Nine days later the authorities found it necessary to hospitalize him again. This stay lasted until April 14, 1969 when he was reconfined in prison. At the request of counsel, Ward was transferred on June 5, 1969 to the Yardville Youth Reception and Correctional Center. Six days thereafter he returned to the hospital and stayed there until August 18 when he was transferred to a closed ward of the State Hospital under a civil commitment. Following an examination by an independent psychiatrist, he was released on parole to return home on October 15, 1969.

The record before us is not sufficient to reveal the relationship between the State Prison confinement of this young first offender and his mental illness. But whether the relationship was coincidence or cause, actual or contributory, the experience should put emphasis on avoidance of inordinately severe prison sentences.

On the whole case, however, no sentence should have been imposed unless and until defendant's guilt had been established by a full and fair trial and unqualified jury verdict. Since he did not have such a trial, I vote to reverse the conviction.

Justice Hall joins in this dissent.

94 

 

*For affirmance as modified*—Chief Justice WEINTRAUB and Justices JACOBS, PROCTOR, SCHETTINO and HANEMAN —5.

*For reversal*—Justices FRANCIS and HALL—2.