# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1344-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

D.C.N.,[1]

     Defendant-Appellant.

_____

Argued October 18, 2021 – Decided November 8, 2021

Before Judges Sumners and Firko.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 16-06-2019.

Scott M. Welfel, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Scott M. Welfel, of counsel and on the brief).

Caitlinn Raimo, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Theodore N. Stephens, II, Acting Essex

---

[1] We use initials to protect the identity of the parties because this matter involves an incident of domestic violence. R. 1:38-3(d)(10).

County Prosecutor, attorney; Caitlinn Raimo, of counsel and on the briefs).

PER CURIAM

Defendant D.C.N. appeals from an amended judgment of conviction and sentence that were entered after a jury found him guilty of second-degree burglary, N.J.S.A. 2C:18-2, the lesser-included offense of simple assault, N.J.S.A. 2C:12-1(a), and third-degree terroristic threats, N.J.S.A. 2C:12-3(b). The trial court sentenced defendant on September 17, 2018, to ten years' imprisonment subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, to run consecutively to his seven-year sentence under Indictment Number 15-01-22I[2] for illegal gun possession. We affirm.

I.

Th evidence at trial showed that during the morning of February 8, 2016, T.B. was at her home in East Orange with her three children: her son, D.I., then thirteen years old; another son, D.Y., then nine years old; and B.C., an infant,

---

[2] This appeal is calendared for November 1, 2021, under docket number A-2737-18T4.

defendant's biological daughter.[3] As T.B. was getting ready to take her sons to school that morning, she noticed the tires on her vehicle had been slashed.

T.B. went back inside her home with the children and texted defendant, who denied slashing her tires. He stated he wanted to come over and bring a pair of sneakers for B.C., but T.B. told him not to. Defendant responded he was already parked across the street. T.B. opened her bedroom window and told him to leave. Eventually, defendant placed the sneakers at the door of T.B.'s residence and left the premises. Defendant continued to text T.B. and inquired whether the sneakers fit B.C., and T.B. responded affirmatively.

A short time later, T.B. heard her chihuahua whimpering downstairs in her house. As she walked down the stairs to tend to her dog, T.B. saw the first-floor bathroom door close and then open, leading her to suspect someone had entered her home. T.B. discovered defendant was the intruder, and she retreated upstairs to her bedroom. She attempted to lock the bedroom door, but defendant pushed it open, prompting her to call 9-1-1 while holding her phone behind her back to avoid defendant seeing it. T.B. was hopeful that the 9-1-1 operator

---

[3] D.I. and D.Y. have the same initials, D.E., so they are referred to by the first two letters of their respective first names for clarity purposes. B.C. is an abbreviation of the child's nickname, which is how the witnesses referred to her in their testimony.

would hear the interaction with defendant and dispatch officers to the scene to assist her.

Defendant began yelling and cursing at T.B., accusing her of sleeping with another man. T.B. asked D.I., who had been feeding B.C. in the room, to leave so he would not hear defendant's profane language. Defendant then abruptly punched T.B. in the left temple, causing her to see "white, like a bright, bright white, and . . . it took [her] some time to . . . collect [her]self." T.B. later ended up in a shelter, where she photographed her face, including her eye and temple area, the day after the incident. The photograph depicted a black eye and a "knot," which T.B. testified persisted at the time of trial.

Defendant then pulled up his pant leg, revealing a knife, and said "I came here to slash your throat and kill you." T.B. grabbed defendant's hands and looked him in the eyes in an attempt to calm him down. She also called for her sons to come in the room hoping they would help her to calm defendant. The sons' presence did not alleviate defendant's agitated state, therefore, T.B. told the children to leave and return to their room.

T.B. and defendant then "went into another room," and he "kept shushing for [T.B.] to be quiet." T.B. noticed defendant was wearing latex gloves, which frightened her. She said to defendant "well, since you said you did not slash the

4

tires can you please help me fix it[?]  Let's go outside."  After defendant walked out of the house, T.B. quickly telephoned her mother and told her to call the police.  Defendant returned to get T.B. and the two walked outside towards her vehicle.

Less than five minutes later, the police arrived at the scene.  Officer Clothy Isabel Ortiz approached T.B. and defendant, who were inspecting T.B.'s tires.  Officer Ortiz remained separated from the two by a small fence and asked T.B. whether she was all right.  Because T.B. was concerned defendant could still attack her before Officer Ortiz could react and navigate the fence, T.B. verbally responded that everything was fine but gave the Officer a look of panic.  Officer Ortiz noted that T.B.'s tires were slashed, recognized the "fear in her eyes," and moved T.B. away from defendant so they could speak privately.  T.B. pulled back her hair and showed Officer Ortiz the bruise on her face where defendant had punched her and told the Officer she was "scared [defendant]'s gonna kill me."  Officer Ortiz signaled to her partner, Officer Eric Rodriguez, to stand by defendant.  Officer Rodriguez detained defendant and performed a protective pat down search, which revealed latex gloves, but no knife or other weapon on his person.

A-1344-18

T.B. and Officer Ortiz entered the home, and the Officer noted the door to the back of the house had been broken into, evidenced by the broken lock. Upon exiting the home, Officer Ortiz signaled to Officer Rodriguez to place defendant under arrest. Officer Ortiz then reentered the home and T.B. explained the interactions that had taken place earlier in the day with defendant. Officer Ortiz asked T.B. to gather her children, which she did, and they left together. Officer Rodriguez transported defendant to police headquarters, where he was interviewed by Detective Phillip Reed. Defendant gave a statement after waiving his Miranda[4] rights.

T.B. and her children arrived at police headquarters with Officer Ortiz, who encouraged her to find a safe place to stay. T.B. asked for assistance in obtaining a restraining order against defendant and temporary housing. Ultimately, Officer Ortiz found a shelter for T.B. and her children. At the shelter, T.B. experienced difficulty eating because her bottom teeth felt loose because of the blow to her temple.

Defendant was charged with second-degree burglary, N.J.S.A. 2C:18-2 (count one); third-degree aggravated assault, N.J.S.A. 2C:12-1(b)(7) (count two); two counts of second-degree endangering the welfare of a child, N.J.S.A.

---

[4] Miranda v. Arizona, 384 U.S. 436 (1966).

2C:24-4(a) (counts three and four); third-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a) (count five); and third-degree terroristic threats, N.J.S.A. 2C:12-3(b) (count six).

Prior to trial, the court conducted a Rule 104 hearing to ascertain the admissibility of defendant's statements to the police and the validity of his Miranda waiver, which were denied and are not challenged on appeal. Officers Ortiz and Rodriguez, T.B., D.I., and D.Y. testified at trial. Initially, defendant chose to testify, but after further consultation with his counsel, he decided against doing so. After the State rested, defendant moved for a judgment of acquittal as to each of the six counts of the indictment. The trial court granted the motion as to counts three, four, and five, and denied the motion as to counts one, two, and six.

On May 2, 2018, the jury was charged and began deliberating. The following day, juror number one was discharged for medical reasons and replaced by alternate juror number three. The next day, at 4:05 p.m., the jury foreperson sent a note to the court indicating a verdict had been reached. The foreperson read the verdict in open court, finding defendant guilty of count one (burglary), guilty of the lesser-included offense of simple assault as to count two, and guilty on count six (terroristic threats). In addition, the foreperson

indicated the verdict was unanimous; however, when the court polled the jury, juror number three replied "I'm not sure" when asked whether that juror agreed with the verdict.

The trial court then asked the jury to return to the jury room for further deliberations. At 5:07 p.m. a verdict had yet to be reached, prompting the trial court to bring the jury back into the courtroom. They were instructed:

> You're going to go back into the jury room and you're going to write me a note. And that note is going to say one of two words; stay or go. Stay the [c]ourt will take to mean that you believe it may be fruitful to stay now. Go would mean you're coming back tomorrow at 9:00. Those are the alternatives; stay or go. Please go into the jury room and we will await your note.

At 5:15 p.m. the jury returned a note reading "stay," and at 5:25 p.m. the jury returned another note indicating a verdict had been reached. The verdict matched the one previously announced, and this time all of the jurors indicated they agreed with the verdict.

Defendant was sentenced and this appeal ensued. On appeal, defendant presents the following arguments for our consideration:

> POINT I
>
> THE COURT'S RESPONSE TO THE NONUNANIMOUS VERDICT—OUTING JUROR [THREE] AS THE SOLE DISSENTER, FAILING TO

GIVE A CZACHOR[5] CHARGE, AND ASKING THE JURORS IF THEY WANTED TO DELIBERATE PAST 5:00 P.M.—WAS COERCIVE. (Not Raised Below).

POINT II

DEFENDANT'S CONVICTIONS MUST BE REVERSED BECAUSE THE COURT ERRED IN FAILING TO CHARGE THE LESSER-INCLUDED OFFENSE OF CRIMINAL TRESPASS, WHICH WAS CLEARLY INDICATED BY THE EVIDENCE. (Not Raised Below).

POINT III

A REMAND FOR RESENTENCING IS REQUIRED BECAUSE THE TRIAL COURT ERRED IN FINDING AND WEIGHING AGGRAVATING FACTORS THREE, NINE, AND FOURTEEN, AND FAILED TO ASSESS THE FAIRNESS OF THE OVERALL SENTENCE AS PART OF ITS YARBOUGH[6] ANALYSIS.

A. The Court's Finding Of Aggravating Factor Fourteen Was Error Because T.B.'s Children Were Not Present During The Assault Or Threats.

B. The Court[] Failed To Assess The Fairness Of The Overall Sentence As Part Of Its Yarbough Analysis.

C. Once The Court Had Determined To Run This Sentence Consecutive To The Sentence For Indictment 15-01-222-I, It Erred In Relying On Aggravating

---

[5] State v. Czachor, 82 N.J. 392 (1980).

[6] State v. Yarbough, 100 N.J. 627 (1985).

9

Factors Three And Nine To Justify A Top-Range Sentence.

## II.

Defendant's first point on appeal claims that the trial court's reaction to juror number three responding "not sure" when polled was unduly coercive. Specifically, defendant asserts the trial court pressured juror number three by: (1) polling the other jurors and publicly outing juror number three as the sole dissenter; (2) directing the jury to continue deliberating without giving a Czachor[7] charge; and (3) interrupting deliberations by directing the jury to return a note indicating "stay" or "go."

Since defendant did not raise these arguments at trial, he must prove plain error that was "clearly capable of producing an unjust result." R. 2:10-2. "Plain error is a high bar." State v. Santamaria, 236 N.J. 390, 404 (2019). "The 'high

---

[7] The charge is given to the jury when the court is informed they may be deadlocked. See State v. Ross, 218 N.J. 130, 143-45 (2014); State v. Figueroa, 190 N.J. 219, 231-39 (2007). Usually, upon being so notified, a court will charge the jury in accordance with the Model Jury Charge (Criminal), "Judge's Inquiry When Jury Reports Inability to Reach Verdict" (2013), as follows:

> You have indicated that your deliberations have reached an impasse. Do you feel that further deliberations will be beneficial, or do you feel that you have reached a point at which further deliberations would be futile? Please return to the jury room to confer, and advise me of your decision in another note.

standard' used in plain error analysis 'provides a strong incentive for counsel to interpose a timely objection, enabling the trial court to forestall or correct a potential error.'" Ibid., (quoting State v. Bueso, 225 N.J. 193, 203 (2016)). Where a defendant raises a new issue on appeal, he "bears the burden of establishing that the trial court's actions constituted plain error." Id. at 404-05.

A trial court is not prohibited from interrupting deliberations to inquire about time-management concerns. See State v. Barasch, 372 N.J. Super. 355, 361-62 (App. Div. 2004). Whether the interruption amounted to coercion must be examined on a case-by-case basis. Id. at 362. As a general matter, coercion will more likely happen when the court sets or implies a deadline for deliberations. See State v. Nelson, 304 N.J. Super. 561, 566 (App. Div. 1997). When the court simply inquires about the anticipated amount of time a jury will need to continue deliberations, coercion is less likely. See State v. Tarlowe, 370 N.J. Super. 224, 238 (App. Div. 2004).

The right to a unanimous verdict is an essential component of the defendant's right to a jury trial. State v. Milton, 178 N.J. 421, 431 (2004); see also R. 1:8-9 (establishing that verdicts in all criminal actions must be unanimous). "Further, under New Jersey [l]aw[,] it is well[-]established that 'the accused has an absolute right to have the jury polled.'" State v. Rodriguez,

11

254 N.J. Super. 339, 349 (App. Div. 1992) (quoting State v. Schmelz, 17 N.J. 227, 232 (1955)). Rule 1:8-10 governs situations such as this. The rule states:

> Before the verdict is recorded, the jury shall be polled at the request of any party or upon the court's motion . . . . If the poll discloses that there is not unanimous concurrence in a criminal action . . . the jury may be directed to retire for further deliberations or discharged.

While it is appropriate "to inquire of the jury whether further deliberations will likely result in a verdict . . . it is not always necessary for the trial court to do so." Figueroa, 190 N.J. at 240 (citations omitted). Moreover, a "[f]ailure to timely object to either the lack of a poll of the jurors or a defect in the polling constitutes a waiver of rights." Rodriguez, 254 N.J. Super. at 349 (citing State v. Ward, 57 N.J. 75, 79 (1970)); see also Figueroa, 190 N.J. at 241 n. 10 (noting a defendant's "fail[ure] to object to the charge when given, result[s] in [the appellate court's] application of a plain error analysis.").

A trial court also has discretion "to decide whether repeating the [jury] charge [on further deliberations] is appropriate when a jury . . . is unable to agree." Id. at 235. The decision can be based on "such factors as the length and complexity of trial and the quality and duration of the jury's deliberations." Czachor, 82 N.J. at 407. In State v. DiFerdinando, 345 N.J. Super. 382, 393

(App. Div. 2001), we concluded that two days and one hour of deliberations did not constitute a sufficient length of time to require a repeated Czachor charge.

Here, the trial court posed a question to both parties as to whether they wanted the jury to return to the jury room to deliberate on May 3, and both parties agreed. The record shows the trial court and counsel for each party agreed to inquire of the jury whether they wanted to stay and continue deliberating or leave and return the next day, and neither party objected. After the court advised the jury of their choice, the parties each indicated they had no objection to the process. Polling the entire jury was appropriate here and permitted the trial court to make its discretionary decision as to further deliberations. Under these circumstances, there was nothing inappropriate about the court's comments or procedure and there was no plain error. We have no doubt the trial court asked the note to be returned with "stay" or "go" solely for "trial management reason[s]" and out of "courtesy" to the jury. Barasch, 372 N.J. Super. at 362.

Moreover, the trial court was not obliged to repeat the Czachor charge. This was a relatively short trial—less than two full days of testimony. The trial court provided the jury with a copy of the charge during their deliberations. The jury had barely been deliberating for one day, and there was no indication they

were intensely deadlocked. In any event, "[n]o matter how complicated the case, brevity in jury deliberations is not, in itself, a basis for scuttling a verdict." Veranda Beach Club Ltd. P'ship v. W. Sur. Co., 936 F.2d 1364, 1383 (1st Cir. 1991) (denying relief where deliberations lasted fifteen minutes) (citations omitted); accord U.S. v. Cunningham, 108 F.3d 120, 123 (7th Cir. 1997) (denying relief where deliberations lasted ten minutes); Paoletto v. Beech Aircraft Corp., 464 F.2d 976, 983 (3d Cr. 1972). "Brief deliberation, by itself, does not show that the jury failed to give full, conscientious or impartial consideration to the evidence." Wilburn v. Eastman Kodak Co., 180 F.3d 475, 476 (2d Cir. 1999) (denying relief where deliberations lasted twenty minutes); see, e.g., Sackman v. N.J. Mfrs. Ins. Co., 445 N.J. Super. 278, 292 (App. Div. 2016). Because defendant fails to show the trial court was obligated to reiterate the Czachor charge, there was no plain error. See R. 2:10-2.

## III.

Defendant also argues, for the first time on appeal, that the trial court erred in failing to instruct the jurors on criminal trespass, a lesser-included charge of burglary. Defendant contends he entered T.B.'s home to see if the sneakers he dropped off for B.C. fit, thus, he was not entering the home with the intent to commit a crime, an element of the burglary charge. Again, we disagree.

14                                                                                      A-1344-18

At the outset, we observe that "[w]hen a defendant fails to object to an error or omission [about a jury charge] at trial, we review for plain error. . . . 'unless it is of such a nature as to have been clearly capable of producing an unjust result.'" State v. Funderburg, 225 N.J. 66, 79 (2016) (quoting R. 2:10-2). Reversal is warranted only where an error raises "a reasonable doubt . . . as to whether the error led the jury to a result it otherwise might not have reached." Ibid. (alteration in original) (quoting State v. Jenkins, 178 N.J. 347, 361 (2004)). "The mere possibility of an unjust result is not enough." Ibid. In our review of a trial judge's instructions, if a defendant does not object to an instruction at trial, we "presume[] that the instructions were adequate." State v. Belliard, 415 N.J. Super. 51, 66 (App. Div. 2010) (quoting State v. Morais, 359 N.J. Super. 123, 134-35 (App. Div. 2003)).

In its jury charges, a "trial [judge] must give 'a comprehensible explanation of the questions that the jury must determine, including the law of the case applicable to the facts . . . the jury may find.'" State v. Baum, 224 N.J. 147, 159 (2016) (quoting State v. Green, 86 N.J. 281, 287-88 (1981)). Accordingly, "the [judge] has an 'independent duty . . . to ensure that the jurors receive accurate instructions on the law as it pertains to the facts and issues of each case, irrespective of the particular language suggested by either party.'"

15

Ibid. (alteration in original) (quoting State v. Reddish, 181 N.J. 553, 613 (2004)).

"[I]f the parties do not request a lesser-included offense charge, reviewing courts 'apply a higher standard, requiring the unrequested charge to be "clearly indicated" from the record.'" State v. Fowler, 239 N.J. 171, 188 (2019) (quoting State v. Alexander, 233 N.J. 132, 143 (2018)). Further, there must be a rational basis "to acquit defendant of the greater[-included] offense," before a court is required to deliver the lesser charge. N.J.S.A. 2C:1-8(e); see e.g., State v. Denofa, 187 N.J. 24, 41-42 (2006). As such,

> [t]he "clearly indicated" standard does not require trial [judges] either to "scour the statutes to determine if there are some uncharged offenses of which the defendant may be guilty," or "'to meticulously sift through the entire record . . . to see if some combination of facts and inferences might rationally sustain' a lesser charge." Instead, the evidence supporting a lesser-included charge must "jump[] off the page" to trigger a trial [judge's] duty to sua sponte instruct a jury on that charge.
>
> [Alexander, 233 N.J. at 143 (third and fourth alterations in original) (citations omitted).]

It is well settled that criminal trespass is a lesser-included offense of burglary. State v. Clarke, 198 N.J. Super. 219, 225-26 (App. Div. 1985). Both criminal trespass and burglary require the State to establish that a defendant

16

entered a structure without a license or privilege to do so. See N.J.S.A. 2C:18-2; N.J.S.A. 2C:18-3(a). Burglary, however, requires proof of an additional element: that the defendant enter the structure with the intent to commit an offense therein. See N.J.S.A. 2C:18-2; State v. Singleton, 290 N.J. Super. 336, 341 (App. Div. 1996).

Our review of the record reveals no rational basis permitting a jury to convict defendant of fourth-degree criminal trespass under N.J.S.A. 2C:18-3(a) instead of burglary, N.J.S.A. 2C:18-2. Defendant presented no evidence to support his theory that his purpose in entering T.B.'s home was to ensure the sneakers he dropped off for B.C. fit her properly. The record shows defendant was previously told by T.B. that the sneakers fit. And, prior to charging the jury, the trial court spoke informally with counsel for each party and counsel agreed "there would be no rational basis" to include "criminal trespass as a lesser included offense of the burglary count or harassment as [the] lesser included offense of the terroristic threats count."

Based on this consensus, the trial court stated, "then because of the parties' positions and their views of the evidence, there would be no sua sponte obligation for the [c]ourt to charge those lesser[-included offenses] and the [c]ourt did not." Applying the principles enunciated earlier, we find no error in

17

the court's failure to charge fourth-degree criminal trespass under N.J.S.A. 2C:18-3(a) because we are not convinced the evidence clearly indicated the appropriateness of the charge.

IV.

Finally, defendant claims the sentencing court erred in finding aggravating factors two (N.J.S.A. 2C:44-1(a)(2) (the gravity and seriousness of the harm defendant inflicted on the victim); three (N.J.S.A. 2C:44-1(a)(3) (the risk defendant will commit another offense); six (N.J.S.A. 2C:44-1(a)(6) (the extent of the defendant's prior criminal record and the seriousness of the convicted offenses); nine (N.J.S.A. 2C:44-1(a)(9) (the need for deterring defendant others from violating the law); and fourteen (N.J.S.A. 2C:44-1(a)(14) (the need to deter defendant and others from violating the law), and failed to consider the Yarbough guidelines that are used to determine whether to impose concurrent or consecutive sentences.[8] In the matter under review, defendant was sentenced to an aggregate term of ten years' imprisonment subject to NERA to run consecutively to his seven-year term with a three-and-a-half period of parole ineligibility under Indictment Number 15-01-22I. On September 26, 2018, the

---

[8] Defendant submitted a supplemental brief on May 17, 2021, referencing our Court's recent opinion in State v. Torres, 246 N.J. 246 (2021).

A-1344-18

trial court issued an amended judgment of conviction to remove jail credit previously and erroneously awarded contrary to State v. C.H., 228 N.J. 111 (2017). In his supplemental brief, defendant argues the holding in Torres should be applied retroactively to his case and entitles him to a new sentencing hearing.

The scope of our review of sentencing decisions is narrow. As a general matter, sentencing decisions are reviewed under a highly deferential standard. See State v. Roth, 95 N.J. 334, 364-65 (1984) (holding that an appellate court may not overturn a sentence unless "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience.") Our review is therefore limited to considering:

> (1) whether guidelines for sentencing established by the Legislature or by the courts were violated; (2) whether the aggravating and mitigating factors found by the sentencing court were based on competent credible evidence in the record; and (3) whether the sentence was nevertheless "clearly unreasonable so as to shock the judicial conscience."
>
> [State v. Liepe, 239 N.J. 359, 371 (2019) (quoting State v. McGuire, 419 N.J. Super. 88, 158 (App. Div. 2011)).]

"[A]ppellate courts are cautioned not to substitute their judgment for those of our sentencing courts." State v. Case, 220 N.J. 49, 65 (2014) (citing State v. Lawless, 214 N.J. 594, 606 (2013)). Similarly, a trial court's exercise of

19

discretion that is in line with sentencing principles "should be immune from second-guessing." State v. Bieniek, 200 N.J. 601, 612 (2010).

We first address whether the sentencing court erred in directing the sentence imposed under Indictment Number 16-06-2019 be served consecutively to the sentence imposed under Indictment Number 15-01-22I on the gun possession conviction. In Yarbough, the Supreme Court noted "there can be no free crimes in a system for which the punishment shall fit the crime." 100 N.J. at 643. The Court listed relevant considerations, including whether:

> (a) the crimes and their objectives were predominantly independent of each other;
>
> (b) the crimes involved separate acts of violence or threats of violence;
>
> (c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;
>
> (d) any of the crimes involved multiple victims;
>
> (e) the convictions for which the sentences are to be imposed are numerous.
>
> [Id. at 644.]

In Torres, our Court reiterated "that while Yarbough guides a court's sentencing decision, it does not control it." 264 N.J. at 269. That conclusion

20

comports with the major tenet in State v. Cuff, a sentencing court's focus "should be on the fairness of the overall sentence." 239 N.J. 321, 352 (2019) (citing State v. Miller, 108 N.J. 112, 121 (1987)); see also Torres, 246 N.J. at 270 (holding an "evaluation of the fairness of the overall sentence is 'a necessary feature in any Yarbough analysis.'" (quoting Cuff, 239 N.J. at 352)). We agree with the sentencing court that in the particular circumstances of this case, the criminal act of illegal gun possession was independent of the charges the jury found defendant guilty of in the present matter and is supported by our Court's holdings in Yarbough and Torres.

Here, the sentencing court properly addressed and analyzed each aggravating and mitigating factor, finding the aggravating factors preponderated and no mitigating factors applied. We discern no abuse in the sentencing court's discretion nor did the sentence it imposed shock our judicial conscience. The court sentenced defendant in accordance with the sentencing guidelines. We have no cause to disturb defendant's sentence.

To the extent we have not addressed any of defendant's arguments, it is because we have concluded they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

21

A-1344-18